## Di Marcantonio v. State Workmen's Insurance Fund et al.

*Morton Z. Paul*, for claimant; *Ralph H. Behney*, for defendants.

MacDade, J., March 21, 1931.—Claimant herein has filed a petition seeking compensation in behalf of herself and minor children for the death of her husband, which occurred on Sept. 20, 1928, while employed by the employer defendant.

The cause of the accidental death is given in the petition as "seven explosions of dynamite had been set off and deceased was asphyxiated by gases and died."

The referee after answer and hearing awarded compensation, and the defendant then appealed to the Workmen's Compensation Board, contending that the referee's findings of fact were not supported by the evidence and that there was error as to the conclusions of law and award.

The contention of the claimant then as now was that poisonous gases, and particularly carbon monoxide, caused the death of the decedent, which occurred in a stone quarry and during the course of his employment with the defendant.

The defendant then set up that this was not the cause of death and that there was no testimony to support such a finding of fact that his death was the result of an accident as provided by the Compensation Act.

However, the Workmen's Compensation Board, in an opinion filed Jan. 30, 1930, in stating that the referee had correctly decided the case and that his findings were amply sustained by the evidence, said, *inter alia:* "Our exam-

ination of the testimony convinces us that the claimant has met the burden of proof by showing the decedent's death was caused by such gases."

From this award we had an appeal to review the record as thus made up and as well for our consideration whether to grant a rehearing in accordance with a prayer of the defendant in a petition for a rehearing duly filed.

Therefore — to summarize — after hearing on the original petition and answer, the referee awarded compensation, *finding that the decedent died as the result of carbon monoxide poison* in the course of his employment with his employer on Sept. 21, 1928. The Workmen's Compensation Board found that this finding of the referee was based on the preponderance of competent and convincing testimony in the case, and affirmed the action and award of the referee.

The case was then appealed to this court, which was of the opinion that additional testimony should be taken, and remitted the record to the board for such testimony.

The testimony of Dr. J. C. Attix, explosive expert, and Dr. J. M. Hutchins, who performed the post-mortem on the body of decedent subsequent to his death, was added to the record, and the referee again found that the deceased husband of claimant died "as the result of carbon monoxide poison in the course of his employment with his employer on Sept. 21, 1928." The referee has made a very careful analysis and complete summary of the testimony and there is little that we can add to this and our former opinion.

However, a further appeal was taken from the referee's award to the said board, and the latter has again affirmed the action and award of the referee (see opinion filed Jan. 22, 1931).

Now this court has another appeal (filed Feb. 21, 1931) before it, which we shall now consider in connection with the exceptions filed, which are as follows:

"1. That the board erred in sustaining the findings of fact and conclusions of law of the referee.

"2. That the board erred in dismissing the defendant's appeal.

"3. That neither the referee nor the Workmen's-Compensation Board had before it sufficient, competent evidence to sustain the finding of fact made by the referee in his third finding of fact, which, in part, reads as follows:

" " '3. On Sept. 20, 1928, claimant's decedent, Ernesto Di Marcantonio, while in the course of his employment with Lewis Snyder, the employer, working in a stone quarry at Springfield, Delaware County, Pennsylvania, *several minutes after seven blasts* of dynamite had been exploded, entered the quarry into a hole about four feet deep, excavated by the explosion, and *several minutes thereafter* called for help, when a co-employee, Angelo Capuzzi, went to his rescue. He found him sitting on a stone and a few minutes thereafter fell unconscious. He was then taken out of the quarry, removed to the Delaware County Hospital, where he died the following day.'

"Appellant avers that there is no evidence to support this finding, but, on the contrary, the evidence as to time indicates that seven pop blasts were set off in the quarry at 8 or 8.15 A. M. on the morning in question and claimant's husband collapsed on the premises at 9 or 9.15 A. M. on said day, and was received at the hospital at or about 10 A. M.; and instead of several moments intervening between the time when the employee entered the quarry and his being overcome, the evidence is clear, positive and unequivocal that approximately one hour intervened between the time when the seven small blasts were set off and the collapse of this employee, which evidence is further corroborated by the testimony of the employer that he observed the pile of small

broken stone made by said employee out of the stone that was broken up into small pieces by the seven pop blasts in question.

"4. That the referee did not have any competent or sufficient evidence of the presence of carbon monoxide gas upon the premises of the employer at the time he suffered the cerebral hemorrhage from which he died, which finding was affirmed by the Workmen's Compensation Board without the taking of additional testimony and without having before it any evidence to support the said finding.

"5. That neither the referee nor the Workmen's Compensation Board had before it any sufficient or competent evidence to support its finding '. . . that the decedent died as the result of carbon monoxide poison in the course of his employment with his employer on Sept. 21, 1928. . . .'

"On the contrary, your appellant avers that the evidence unmistakably shows that deceased employee died as a result of a cerebral hemorrhage; that a clot of blood the size of a silver dollar was found in the brain of decedent at the autopsy made on his body; that the blood stream was not light pinkish in color and of that type or structure which is found in persons suffering from the effects of carbon monoxide poisoning; and that the lungs and pulmonary organs of deceased employee showed no effect from the inhalation of carbon monoxide gas; all of which evidence is incompatible and contrary to the finding that this death was caused or aggravated by inhaling carbon monoxide gas.

"6. That claimant has failed to meet the burden of proof resting upon her to prove by expert medical testimony that the death of her deceased husband was actually caused by the alleged cause, since there was no evidence before the referee of the presence of carbon monoxide gas in the quarry of the employer at 9 or 9.15 A. M., and since the autopsy made upon the body of the deceased employee conclusively showed that death was caused by a cerebral hemorrhage due to sclerosis of the artery in the brain.

"7. That the evidence offered by the medical experts produced by the claimant, and testifying in her behalf, does not meet the well recognized standard or rule of evidence required of one bearing the burden of proof, in view of the well recognized rule of law that when a plaintiff depends on medical testimony, 'the witness would have to testify, not that the condition of plaintiff might have, or even probably did, come from the accident, but that, in his professional opinion, the result in question came from the cause alleged.'

"8. That the referee and board erred, as a matter of law, in granting compensation to the claimant, in view of the fact that the expert testimony relied upon by the claimant to sustain her contention utterly lacked the consistency required of proofs of this character when submitted by one charged with meeting and sustaining the burden of proof.

"9. That the board erred, as a matter of law, in granting compensation to this claimant, because the said compensation authorities were dependent upon expert testimony to enable them to intelligently reach a decision, and the record in this case discloses that the claimant, having produced medical experts to testify on her behalf, offered inconsistent testimony as to the alleged cause of death and let the compensation authorities to guess at which of the theories advanced by claimant on her behalf was correct, defendant contending that the compensation authorities cannot and are not obliged to choose between inconsistent and equivocal evidence tendered by the claimant's medical experts.

"10. That the referee and board erred, as a matter of law, in awarding compensation, in view of the testimony offered by the several expert witnesses

called by the claimant to establish, by their opinions, the superinducing cause of the death of claimant's deceased husband, in view of the inconsistent evidence offered and produced by the several experts to establish this claim; since the doctrine of the law is well defined that expert opinions offered on behalf of a claimant must so harmonize that a finding be not based upon the acceptance of one or the other of two or more inconsistent inferences, for in such circumstances the adoption of either would be a mere guess and the plaintiff would thus have been relieved from the necessity of sustaining the burden of proof resting upon her.

"11. That in view of the undisputed and uncontradicted testimony of Dr. Hutchins, who performed the autopsy, that he found a clot of blood the size of a silver dollar in decedent's brain, the finding of the referee, as affirmed by the board, that the employee died as a result of carbon monoxide poison is utterly inconsistent with all the evidence given by the medical witnesses to the effect that when a person suffers carbon monoxide poisoning, the red corpuscles of the blood are destroyed; that the blood has a light pinkish color; that the blood of such a person will not clot or congeal; none of such evidence having been contradicted by any of the witnesses appearing before the referee.

"12. That the Workmen's Compensation Board erred in affirming the award of the referee."

These proceedings seem to be regular and in accordance with the practice suggested in Johnson v. State Workmen's Insurance Fund, 100 Pa. Superior Ct. 12.

It is also a fact that compensation authorities are to decide all questions of fact and the court is to decide those of law: Johnson v. State Workmen's Insurance Fund, supra.

Indeed, the findings of the compensation authorities, supported by competent proof, and the inference to be drawn therefrom, are as conclusive on the courts as the verdict of a jury: Krischunas v. Phila. & Reading C. & I. Co., 296 Pa. 216; Johnston v. Payne-Yost C. Co., 292 Pa. 509; Todd v. State Workmen's Insurance Fund, 295 Pa. 14; Piper v. Adams Express Co., 270 Pa. 54; Ford v. A. E. Dick Co., 288 Pa. 140.

We are limited to a determination, in this appeal, of the questions whether or not there is competent evidence to support the findings, and whether the law has been properly applied: Rodman v. Smedley, 276 Pa. 296; Poffinberger v. Martin Co., 83 Pa. Superior Ct. 524; McCarthy v. General Electric Co., 293 Pa. 448; Bradley v. Congoleum Nairn, Inc., 92 Pa. Superior Ct. 374.

If the findings of fact herein are from ample positive evidence and inferences therefrom do sustain them, we cannot interfere: Kuca v. Lehigh Valley Coal Co., 268 Pa. 163; Dainty v. Jones & Laughlin Steel Co., 263 Pa. 109; Poluskiewicz v. Phila. & Reading Co., 257 Pa. 305; Morris v. Vough Coal Co., 266 Pa. 216; Todd v. Lehigh Valley Coal Co., 297 Pa. 302; Walsh v. Glen Alden Coal Co., 99 Pa. Superior Ct. 58.

It is not for us to weigh the evidence and to reverse the findings of fact of the referee and the Workmen's Compensation Board, our province being to determine whether there was competent and sufficient evidence to sustain the referee's findings of fact in the instant case and whether the law was correctly applied: Rodman v. Smedley, 276 Pa. 296; Vorbnoff v. Mesta Machine Co., 286 Pa. 199; Ford v. Dick Co., 288 Pa. 140; McCauley v. Imperial Woolen Co., 261 Pa. 312.

The court is without power to reverse the action of the board on its findings of fact: Fahringer *v.* Bauerle Co., 100 Pa. Superior Ct. 89; Act of June 26, 1919, § 6, P. L. 642.

We have examined with care all the testimony offered in support of and against the present claim, and without discussing it in detail we are of the opinion that there was sufficient competent evidence to sustain a finding that the decedent, Ernesto Di Marcantonio, died as a result of an accidental injury in the course of his employment with the employer as contemplated in article III of the Workmen's Compensation Act of 1915, and the amendments thereto, and that his widow, the claimant, and his six minor children, dependents, are entitled to compensation as provided in section 307, article III, of said act, and in accordance with the table of distribution in the award of the referee and affirmed by the said board, together with interest and costs, and in accordance with the Act of June 26, 1919, § 427, P. L. 642, 666, to wit: "The court shall enter judgment for the total amount stated by the award or order to be payable, whether then due and accrued or payable in future instalments."

The additional testimony was taken before the referee, as we ordered in our opinion, remitting the record to the said board for such testimony, namely, that of Dr. J. C. Attix, explosive expert, and Dr. J. M. Hutchins, who performed the post-mortem on the body of decedent subsequent to his death, and was added to the record, and the referee again found that the decedent husband of claimant died "as the result of carbon monoxide in the course of his employment with his employer on Sept. 21, 1928."

Briefly, the testimony in this case shows it was the opinion of Doctors Davis, Mehrig and Katar that the death of the decedent was caused by the inhalation of carbon monoxide gas, resulting from the explosion of dynamite. And this was clearly the opinion of Dr. J. M. Hutchins, physician to the Coroner of Delaware County, and who performed the autopsy on the day the decedent died. Here are four physicians, one of whom was the family physician, so testifying, and opposed to them is Dr. Attix, who never saw the decedent, who was only thirty-seven years of age and in good health, who states as an expert that, in his opinion, the death of decedent was not caused by gases generated from the explosion of dynamite.

In the language of the board, in affirming the findings of fact of the referee and which we now adopt, the testimony (Dr. Attix's) was "contradictory, and while the opinion of Dr. Attix is entitled to great consideration when he states that the death was not caused by gases arising from dynamite explosions, this opinion is answered by testimony of claimant's medical witnesses clearly and convincingly that death was so caused. A question of fact was largely involved and the referee has accepted the opinion of several physicians as to the cause of death, and his action we believe was clearly correct. The weight of the testimony is strongly in favor of the theory that the decedent met his death as the result of carbon monoxide poisoning at the time of the explosion. The credibility of the witnesses was largely for the referee, as he had an opportunity of seeing them, hearing their testimony and observing their manner of testifying. Under all the facts and circumstances of the case, the referee has, in our opinion, made a correct disposition thereof, and we affirm his findings of fact, conclusions of law and award of compensation."

All of the four doctors for the claimant practically agreed that the man died from poisonous gases following the explosion of dynamite.

In all of these gas accidents, in which the claimant has been permitted to recover, opinions were received as to the nature of the gas which the dece-

dent breathed and which caused his death. Experts, of course, were not present when the accident happened. The referee and the courts took the facts as set forth by their witnesses and reached their conclusion from scientific knowledge applied to those facts.

In this case there was no other cause to create gas in this quarry but the explosion of dynamite. Nothing else could have asphyxiated this man but the gases from dynamite explosion. The question then arose, what were those gases? All the doctors for the claimant concluded and gave as their opinion that it was carbon monoxide gas. While the appellant herein lays special stress on the fact of a hemorrhage of the brain being discovered by an autopsy, all of these doctors were of the opinion without any equivocation that as soon as the oxygen is kept from the lungs, high blood pressure immediately starts in and this was the cause of the hemorrhage of the brain. Instead, therefore, of there being a diversity of opinion among these doctors for the claimant on the cause of death, the opinion is unanimous and was convincing to the referee and the Workmen's Compensation Board.

The authorities in gas cases rule that "the involuntary inhalation of poisonous gas is an accidental injury," and "the injury to the physical structure of the body need not be of external violence:" Baith v. Ætna Co., 2 Pa. Workmen's Comp. Bd. 373, 3 Dept. Reps. 2875; McCauley v. Imperial Woolen Co., 261 Pa. 312.

We are not permitted to weigh conflicting evidence, under the Act of June 26, 1919, P. L. 642, or decide what inferences should be drawn therefrom: Stahl v. Watson Coal Co., 268 Pa. 452; Thomas v. State Workmen's Insurance Fund, 280 Pa. 331.

This decedent, it must be borne in mind, was working in a quarry which was a circular excavation cut out of a hill, rock walls on three sides, with woods all around it except the front, which is partially open. The rear or back wall of the quarry is high and forms a corner. The floor of this quarry slopes downward from the roadway in front, and far in the quarry near the rear wall there was a hole which had been blasted out.

Seven blasts of dynamite had been exploded at this point that morning.

When dynamite explodes, a gas called carbon monoxide is formed which is much heavier than air. It lay low on the ground and filled this hole and the surrounding floor of the quarry. The air was very damp and heavy, which prevented the carbon monoxide gas from getting away, and there was no wind to drive it away. Besides, wind could not get down into the floor of the quarry.

A few minutes after the explosion and before the gas had cleared away, Di Marcantonio went back into this hole to work. Later, he staggered and called for help, lost consciousness, was taken to a hospital, never regained consciousness and died the next day.

The referee was most painstaking in his attempt to get all the evidence possible covering the facts in this case.

For proof that carbon monoxide, a deadly poison, is created by the explosion of dynamite, we are referred to the testimony of Dr. Felix M. Katar, found on page 47 of the testimony on the first hearing, to a hypothetical question, viz.:

"From the above reading, Mr. Paul, I am convinced that the cause of death was carbon monoxide poisoning. From the evidence in this case as set forth in the facts mentioned in the question asked, it appears that Ernest Di Marcantonio was a young man of thirty-seven years, accustomed to hard, outdoor work, strong and robust, perfectly healthy when he worked with his

employer the day before the accident, healthy and well, according to his wife, when he left home the morning of the accident, and his helper said he never knew him to be sick before the day of the accident, and he worked every day.

"When a man of that type in perfect health went into a quarry right after seven explosions of dynamite had been set off, and there appearing to be no intervening cause of death, it is my opinion that unquestionably the cause of his death was asphyxiation by poisonous carbon monoxide gas.

"My reasons for this are set forth as follows:

"The facts show the quarry was in the side of a hill, cut down thirty-five to forty feet from the top of the hill; woods around the quarry except in front, where it was partly open. It was a very wet, damp day, and no wind to drive the smoke and gases from the explosions away.

"The man was working in a hole about four feet deep below the floor of the quarry. It was here the explosions took place. And these gases being heavy, and as there was no wind that day, and it being difficult for the wind, even if it was blowing, to have pushed the gases out of this hole four feet deep, Di Marcantonio got enough of this gas to rob him of the necessary oxygen, cause high blood pressure and a hemorrhage of the brain, which killed him.

"One of the most insidious and dangerous gases which arise from the explosions of nitroglycerine or dynamite is carbon monoxide. The blood must have oxygen, and when deprived of it high blood pressure results, and this often causes a hemorrhage of the brain. And this man had such a hemorrhage, according to the verdict of the coroner, which I read, or of which I was informed.

"I have examined the works of some of the greatest chemists on this subject and made extracts from their works as follows:

" 'The general result of experiments conducted by Bedson, by Kullen and by Weiskopf with nitroglycerine explosives establishes the fact that carbon monoxide occurs in the explosion products of all carbonaceous explosives and is occasionally accompanied by oxides of nitrogen contributed by the nitrate ingredients.' This is taken from J. Therburn, in 46 Journal Society of Chemical Industry, 358 (1927).

" 'Some of the products formed by explosives are poisonous, notably carbon monoxide, which is produced in considerable proportion whenever the oxygen in the explosion is insufficient to convert all the carbon into dioxide and the hydrogen into water. The gases from black powder of standard composition contain from 8 to 17 per cent. of carbon monoxide. . . . The highly poisonous character of carbon monoxide is due to the fact that its affinity for the hemoglobin of the blood is about 250 times that of oxygen. Consequently, when a man works in an atmosphere contaminated with the gas, his blood gradually becomes more and more inactive and only regains its full power of supporting life many hours after the man has returned to a normal atmosphere. Two to 3 per cent. of carbon monoxide is dangerous to life. . . .

" 'There are many cases on record of men going home quite recovered from the effects and then dying in convulsions in the night—several hours afterwards.

" 'In a series of experiments to ascertain the amount of carbon monoxide released by the explosion of dynamite, the following was found:

" '30 per cent. straight nitroglycerine dynamite.........28.4 per cent.
40 per cent. straight nitroglycerine dynamite.........26.9 per cent.
50 per cent. straight nitroglycerine dynamite.........31.2 per cent.
60 per cent. straight nitroglycerine dynamite.........34.6 per cent.'

"The foregoing is taken from Explosives, volume 2, page 576, by Arthur Marshall, Chemical Inspector, Indian Ordnance Department.

" 'Nitroglycerine has a very powerful physiological effect. Merely handling it or entering a house containing it will often give a violent headache to any one not accustomed to it:' 2 Explosives, 735, by Arthur Marshall.

" 'Oliver states that the inhalation of the fumes given off by high explosives may cause violent headache, vomiting, palpitation of the heart and partial or complete collapse:' Diseases of Occupation and Vocational Hygiene (Kober-Hanson), page 566.

" 'Carbon monoxide, sometimes called white damp, is produced in explosions in blasting operations. . . . This gas causes a great many deaths among miners and workers in the mineral industries. It is without odor, color or taste, and its effects often go unnoticed by the victim until too late. The United States Bureau of Mines found that a canary bird collapsed in the presence of 2 per cent. of carbon monoxide:' Industrial Health (Kober & Hayhurst), page 147.

"Lewin states that carbon monoxide is now and has been since the first discovery of fire the most widespread poison connected with human life and activity.

"McNally states people nearest the floor in a room in which carbon monoxide is escaping are the quickest affected. (Showing the gas is heavy.)

" 'At Cook County Hospital, Chicago, in 1916, there were 501 cases of carbon monoxide poisoning, or 8 per cent. of all coroner's cases. They stood fourth place in numerical order of different forms of death for the year:' Industrial Health (Kober & Hayhurst), page 369, etc.

"In Lippincott's Quick Reference Book for Medicines and Surgery, compiled by Dr. George E. Rehberger, of Johns Hopkins University, he gives as causes of high blood pressure: 'Mental and muscular exertion, increase of intracranial pressure due to hemorrhage and asphyxiation.'

"In the same work on Carbon Monoxide Poisons he states, among other sources of being poisoned from this cause: 'Combustion products from kilns, etc., and blasting in mines.'

"The symptoms following carbon monoxide poisoning are 'headache, muscular weakness, often nausea and vomiting, unconsciousness, clotted blood.'

"For treatment, he recommends oxygen and artificial respiration.

"He also refers to nitroglycerine as poisonous, the symptoms being 'headache, giddiness, palpitation, buzzing in the ears, irregular pulse, weakness, unconsciousness.'

" 'Commercial explosives are solids or liquids that can be instantaneously converted into volumes of gas having many times greater volume. The increased volume exerts both blow and pressure:' Blaster's Hand Book, page 7, by Arthur La Motte, Manager of Technical Section of the duPont Company.

" 'Tests made by the Bureau of Mines show that the detonation of explosives produces large quantities of carbon monoxide. German experiments have shown that the explosion of dynamite contains 34 per cent. of carbon monoxide, and, if there is much hydrogen sulphide present, this may also have a toxication.'

"Taken from Industrial Poisons in the United States, by Hamilton, page 390.

"On page 378, this author cites an illustration of a man who let himself down into a well shortly after a discharge of dynamite and soon fell in a faint at the bottom.

"On page 379, he states: 'Haldane says that in a normal man at rest the tissues consume only a little over one-third of the oxygen the blood brings them, while in muscular exertion about two-thirds are used. Therefore, the blood of a man at rest may become nearly one-third saturated with carbon monoxide without his realizing that anything is wrong, but, if he has to make any considerable exertion, the fraction of his hemoglobin combined with carbon monoxide may not be enough to transport the necessary oxygen and he is liable to collapse. If the blood be more than half saturated, he may collapse even at rest, and, if he remain a considerable time in this condition, the cells of the central nervous system and perhaps the cells of other organs are injured by the lack of oxygen, anoxemia and unconsciousness is the immediate effect, while paralysis or insanity may follow later.'

" 'Henderson estimates that usually a man will die who has breathed two parts per thousand of carbon monoxide mixed with other normal air for four or five hours, or four parts for one hour. . . . The blast furnace of steel mills usually contains 250 to 280 parts of carbon monoxide per thousand. Therefore, in mine accidents as a result of accidental leakage in pipes from a steel blast furnace, a few breaths may be enough to nearly saturate the blood with carbon monoxide, and death follows as quickly as in drowning. . . . With two parts of carbon monoxide to one thousand parts of air utter powerlessness and unconsciousness come on, and three parts means death unless rescue is fairly prompt.' (Page 380.)

"Some of the authors above cited, speak of the effect of carbon monoxide on the hemoglobin of the blood.

" 'The hemoglobin is an organic coloring matter, which constitute about nine-tenths of the weight of dried red blood corpuscles and serves as a carrier of oxygen from the lungs to the general tissues of the body.' . . .

" 'In poisoning by the inhalation of carbon monoxide, this gas combines with the hemoglobin in the lungs and the carbon-hemoglobin so formed does not break up again. As the absorption of the gas continues a continually increasing quantity of hemoglobin is, therefore, destroyed so far as its utility as an oxygen carrier is concerned. In extreme cases of such poisoning, transfusion of blood is resorted to in order that the patient may have a sufficient supply of hemoglobin to transport the requisite quantity of oxygen from the lungs to the other tissues of the body:' 14 Americana Ency., page 89.

"Dynamite is made of silica, one part of silica and 75 per cent. of nitroglycerine.

"Asphyxiation in spite of abundance of fresh air.

"In Kober & Hayhurst's work, entitled 'Industrial Health,' on pages 48 and 547, they state that asphyxiation may result from the explosions of dynamite in spite of an abundance of fresh air. We find the following substances used in the manufacture of explosives, viz., nitro benzenes, tetra nitramlin and several others. All of these act upon the central nervous system and convert the normal hemoglobin in which the gases formerly bound are forced out and replaced by the methenoglobin. That is, the chemical substances essential to life are forced out and the result is asphyxiation in spite of an abundance of fresh air.

"Dr. Hamilton, in the 'Handbook of Experiments of Pharmacology,' by Professor Heffler, of the University of Berlin, a very recent book, states that an inhalation of nitrogen dioxide from the explosion of dynamite increases the blood pressure in warm-blooded animals forty-seven millimeters.

"The first things to be done in cases of asphyxiation is to introduce oxygen into the lungs by artificial respiration. This fact shows that these poisonous

gases, and especially carbon monoxide given off by the explosion of dynamite, drives the oxygen away. If it did not, the person subjected to these gases would not be asphyxiated, and if their lungs had not been deprived of oxygen, you would not have to force oxygen into them to revive them.

"In the World War, where poisonous gases were used, the tanks of gas were opened when the wind was blowing toward the enemy's camp, and, being heavier than air, followed along the ground and incapacitated and frequently killed the soldiers who came in contact with it.

"Therefore, on the basis of my personal experience in reviving persons who had been asphyxiated, where I got there in time, and my experience where others died, when aid was not administered quickly enough, and on the further basis of my general knowledge of chemistry and the authorities I have quoted, there is no question in my mind but that Ernesto Di Marcantonio's death was caused by accidentally breathing poisonous gas fumes from the explosion of dynamite while at his work in a quarry."

Other compensation cases we have examined and of interest and applicable hereto are Ripani v. Dittman et al., 297 Pa. 124; Slemba v. Hamilton & Sons, 290 Pa. 267.

The Act of June 26, 1919, P. L. 642, at top of page 663, states that the facts found by the Compensation Board or referee are final: Calderwood v. Consol. L. & Supply Co., 91 Pa. Superior.Ct. 189; Hornetz v. Phila. & Reading C. & I. Co., 277 Pa. 40; Kerrigan v. Amer. Int. Ship Bldg. Corp., 5 Pa. Work men's Comp. Bd. Dec. 85; Kephart v. Glasgow Iron Co., 2 Dept. Reps. 1800; Flucker v. Carnegie Steel Co., 263 Pa. 113.

It is sufficient if the accidental injury happens in the course of the employment: Laraio v. Pennsylvania R. R. Co., 277 Pa. 382; Callihan v. Montgomery, 272 Pa. 56; Clark v. Lehigh Valley Coal Co., 264 Pa. 529; Lane v. Horn & Hardart, 261 Pa. 329; Granville v. Scranton Coal Co., 76 Pa. Superior Ct. 335.

"Furthermore, it is not necessary that the fall result from an accident, as the fall is the accident; nor is it material that the employee fell because he became dizzy or unconscious. An injury sustained by an accidental fall is compensable although the fall resulted from some disease with which the employee was afflicted. In the instant case, McCarthy was not without the protection of the act, if hurt by a fall, although it resulted from a lapse of the brain, whether it was gumma or merely vertigo. An accidental injury during the course of employment from an unexplained cause is compensable and the burden is not on a claimant to show the exact cause: Zelazny v. Seneca Coal Mining Co., 275 Pa. 397; Laraio v. Pennsylvania R. R. Co., supra; Skinner's Pa. Workmen's Compensation Law, 54. If resulting from temporary mental lapse, it is as compensable as though resulting from the friendly push of a fellow servant or other untoward event:" McCarthy v. General Electric Co., 293 Pa. 448.

In conclusion, we shall quote the latest expression of the Superior Court, which is contained in McCluskey v. Stock Exchange Bldg. Corp. and Ætna Co., 100 Pa. Superior Ct. 136:

" 'Where the death is accidental it is not incumbent upon a claimant to show the exact nature of the accident or just how it occurred: Flucker v. Carnegie Steel Co., 263 Pa. 113. An accident sustained in the course of employment, from an unexplained cause, is compensable: Granville v. Scranton Coal Co., 76 Pa. Superior Ct. 335:' Selazny v. Seneca Coal Co., 275 Pa. 397."

And now, to wit, March 21, 1931, the above matter of an appeal from the award of the Compensation Board under the Workmen's Compensation Law,

coming on to be heard by the court *in banc*, together with argument and briefs of law, after due consideration the court doth order and decree that the exceptions filed to the Compensation Board's award herein be and are hereby dismissed, the appeal therefrom be and is hereby dismissed, the second award of the referee, which award was affirmed by the Workmen's Compensation Board, be and is hereby affirmed and judgment be and is hereby ordered and directed to be entered in favor of the plaintiff and against the defendants in the sum of $8893.03 4/7, together with costs, amounting to $28.42, in accordance with and under the Act of June 26, 1919, § 427, P. L. 642, 666, paragraph 2 thereof (see Johnson *v.* Baldwin Locomotive Works, 98 Pa. Superior Ct. 34).

From William R. Toal, Media, Pa.